UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| TODD MADSEN,<br><br>            Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>            Defendant. | 14-CV-390-FVS<br><br>**ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT** |

**THIS MATTER** comes before the Court without oral argument based upon the parties' cross motions for summary judgment. Plaintiff Todd Madsen is represented by Dana C. Madsen. The Acting Commissioner is represented by Sarah L. Martin.

**BACKGROUND**

Todd Madsen was born on April 1, 1964. (TR 40.) Since the late 1990s, he has worked sporadically as a roofer, a construction laborer, and a farm worker. (TR 43.) As explained in more detail below, Mr. Madsen suffers from

Order ~ 1

degenerative disc disease and carpal tunnel syndrome.  (TR 23.)  He alleges he is no longer able to work because of his impairments.  Accordingly, he has applied for Title XVI supplemental security income ("SSI").  He alleges his disability began on September 7, 2011.  (TR 39.)

The Social Security Administration ("SSA") sent Mr. Madsen's claim to the Disability Determination Services for review.  On November 28, 2011, he was examined by Thomas R. Hull, M.D.  The latter opined Mr. Madsen "would have trouble carrying any heavy loads or performing any activity requiring use of the arms." (TR 217.)  The SSA considered Dr. Hull's assessment when formulating Mr. Madsen's Residual Functional Capacity ("RFC").  (TR 68-70.)  A claimant's RFC is the most he can do in a work setting despite his physical limitations.  20 C.F.R. § 416.945(a)(1).  Given Mr. Madsen's RFC, the SSA decided there are several types of jobs in the national economy he is capable of performing.  (TR 71.)  Consequently, the SSA denied his request for disability benefits.  (TR 72.)

Mr. Madsen asked the SSA to reconsider.  During this phase of the proceedings, Robert Hander, M.D., reviewed Mr. Madsen's medical records and

Order ~ 2

developed an RFC for him.  Dr. Hander agreed there are jobs he is capable of performing.  (TR 82.)  Given Dr. Hander's assessment, the SSA denied reconsideration.  (TR 82-83.)  The SSA informed Mr. Madsen of its decision during April of 2012.

In response, Mr. Madsen asked to have the SSA's decision reviewed by an Administrative Law Judge ("ALJ").  A hearing was scheduled for May 29, 2013.  Prior to the hearing, Mr. Madsen's attorney arranged for him to be evaluated Robert R. Cornell, a vocational specialist.  Mr. Cornell was doubtful.  He concluded, "[Mr. Madsen] is not gainfully employable in his usual and customary occupation or in unskilled and semiskilled jobs within the national labor market."  (TR 328.)

The administrative hearing proceeded as scheduled on May 29, 2013.  Mr. Madsen and his attorney were present.  Mr. Madsen testified he has trouble turning his head either left or right, which limits his ability to drive a car.  (TR 48.)  He testified walking "half a block" is exhausting.  (TR 49.)  He said he can stand in line for, at most, ten minutes.  *Id.*  He explained he has trouble getting up

Order ~ 3

when he bends over or squats down.  (TR 49-50.)  He testified he can carry a ten-pound object "for a little while."  (TR 50.)  However, he also said his ability to grip objects with his hands is substantially impaired.  As he put it, "everything . . . flies out of my hands constantly."  Id.

After taking the testimony of Mr. Madsen and a second vocational expert (Daniel McKinney), the ALJ adjourned the hearing.  On June 10, 2012, he issued an unfavorable decision.  (TR 18.)  The ALJ was not unsympathetic.  He acknowledged Mr. Madsen suffers from "cervical degenerative disc disease with stenosis, lumbar degenerative disc disease with spondylosis, and [mild] bilateral carpal tunnel syndrome . . . ."  (TR 23.)  The ALJ classified Mr. Madsen's medical problems as severe physical impairments.  *Id.*  The ALJ went on to find Mr. Madsen's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . ."  (TR 28.)  That being the case, the ALJ had to assess the credibility of Mr. Madsen's description of "the intensity, persistence and limiting effects of these symptoms . . . ."  *Id.*  In doing so, the ALJ considered the pessimistic opinions of Dr. Hull (the examining physician) and Mr. Cornell

Order ~ 4

(the vocational expert).  He assigned "some weight" to Dr. Hull's opinion.  (TR 29.)  However, looking at the record as a whole, the ALJ decided Mr. Madsen's statements concerning his impairments was "not entirely credible."  (TR 28.)  Despite Mr. Madsen's complaints, the ALJ determined he "has the residual functional capacity to perform light work . . . ."  (TR 26.)  The ALJ recognized Mr. Madsen had not performed light work in the past.  To the contrary, all of his jobs had involved heavy, semi-skilled work.  (TR 29.)  Nevertheless, the ALJ determined Mr. Madsen "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  (TR 31.)  In view of that determination, the ALJ found he is not disabled.  *Id.*

Mr. Madsen asked the Appeals Council to review the ALJ's decision, but, on October 8, 2014, the Appeals Council decided not to do so.  At that point, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1400(a)(5). Mr. Madsen commenced this action on December 5, 2014.  The Court has jurisdiction.  42 U.S.C. § 1383(c)(3).  Both Mr. Madsen and the acting Commissioner move for summary judgment.

Order ~ 5

**MR. MADSEN'S CREDIBILITY**

The ALJ found, ""[Mr. Madsen's] medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]"  (TR 28.)  That being the case, the ALJ had to evaluate "the intensity, persistence, and functionally limiting effects of the symptoms" in order to determine "the extent to which the symptoms affect the individual's ability to do basic work activities."  SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996).  "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects."  *Id.*  A credibility determination involves a careful examination of the record as a whole.  The ALJ must decide whether the claimant's "statements can be believed and accepted as true."  SSR 96-7p, 1996 WL 374186, at *4.  If there is no evidence of malingering on the claimant's part, "the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so."  *Smolen v. Chater*, 80 F.3d 1273, 1283 (9th Cir.1996).  Here, the ALJ discounted Mr. Madsen's credibility.  Mr. Madsen objects to the ALJ's

Order ~ 6

decision.  In order to evaluate the merits of Mr. Madsen's objection, it is necessary to return to the administrative record for additional background.

At some point during 2011, Mr. Madsen moved from the State of Hawaii to Spokane, Washington.  He sought medical care at the Community Health Association of Spokane on at least five occasions during the late summer and early fall of that year.  (TR 194, 196, 199, 201, and 204.)  He complained of chronic pain and explained he had been taking oxycodone.  See, e.g., TR 194.  On August 8, 2011, a physician's assistant issued a prescription for a two-month supply of the pain-killer.  *Id.*  On August 24th, Mr. Madsen met with Belinda Escanio, M.D.  She instituted a pain-management plan and discussed its terms with Mr. Madsen.  (TR 200.)  Among other things, he agreed to submit urine samples periodically.  *Id.*  He again met with Dr. Escanio on September 23rd.  He reported experiencing pain in his neck and arms, as well as numbness in his arms and fingers.  (TR 201.)  He told Dr. Escanio he "[h]as been dropping things out of hand." *Id.*  Dr. Escanio issued another prescription for oxycodone and ordered certain tests. Id.  At some point after the appointment on September

Order ~ 7

23rd, one of Mr. Madsen's urine samples tested positive for methamphetamine. On October 27th, Dr. Escanio confronted him with the results of the test. He hypothesized "his nephew may have thought it was funny if it was put in his drink." (TR 204.) Given the test results, Dr. Escanio stopped prescribing oxycodone for Mr. Madsen. (TR 206.) Instead, she offered medications that would help with withdrawal. *Id.* It does not appear he returned to Dr. Escanio.

On December 9, 2011, Mr. Madsen had an appointment with Tyler Baker, a physician who works at Providence Family Medicine in Spokane. (TR 224.) Dr. Baker reviewed an MRI of Mr. Madsen's cervical vertebrae. According to Dr. Baker, disc disease was "[v]ery notable." (TR 227.) Although the record is not entirely clear, it appears Mr. Madsen requested a prescription for oxycodone. Apparently, Dr. Baker said he would not issue such a prescription until he had reviewed Mr. Madsen's medical records. (TR 221.) At that point, Mr. Madsen disclosed the positive test for methamphetamine. Id. Consequently, Dr. Baker decided not to "start him on stronger narcotic therapy." (TR 227.) However, Dr. Baker did arrange for electromyography ("EMG") in order to better diagnose the

Order ~ 8

source of the numbness in his hands, i.e., whether the numbness was produced by carpal tunnel syndrome or "neck pathology." *Id.* Mr. Madsen's next appointment with Dr. Baker was on January 16, 2012. (TR 221.) He refused to provide a urine sample for testing. Id. Furthermore, his movements during the appointment were inconsistent. When Dr. Baker was examining him, he indicated he was having great trouble moving his head either from side to side or up and down. By contrast, after the examination was over, Mr. Madsen "follow[ed] [Dr. Baker] out of the hall to continue discussion[,] and during that[,] he move[ed]his head freely side to side when shaking [his head to indicate "no"][.] [H]e look[ed] down at paperwork rapidly without any concern for pain and with almost full flexion. I also [did] not appreciate any pain with just generally walking in and out of the office." (TR 222.) The inconsistency in Mr. Madsen's movements, and his unwillingness to provide a urine sample, troubled Dr. Baker. In the end, Dr. Baker refused to prescribe oxycodone. Mr. Madsen never returned to Dr. Baker. (TR 250.)

Order ~ 9

At the administrative hearing, the ALJ questioned Mr. Madsen about the positive test result. The latter acknowledged a problem. "I was having a hard time getting, finding somebody that would engage into a [pain management] program with me." (TR 52.) He testified he admitted his problem to Dr. Baker. "I told him that I had been . . . getting a hold of whatever I could with . . . anything for the pain . . . hydrocodones whatever from friends, or relatives." (TR 52-53.) The ALJ was not satisfied with the answer. He asked, "Did you ever use methamphetamines?" (TR 53.) Mr. Madsen denied intentionally consuming drug. However, he struggled to provide a credible explanation. He told the ALJ he had been staying with a friend at the time he provided the urine sample. "[I]t sounds kind of corny, but his . . . kid -- who's not his kid -- and his little friends one morning decided to spike . . . our coffee[.]" (TR 54.)

The ALJ was not persuaded by Mr. Madsen's hypothesis. He determined Mr. Madsen "goes from provider to provider seeking pain medications[.]" (TR 28.) He noted Mr. Madsen had disclosed the positive test results to Dr. Baker only after Dr. Baker told him he intended to review his records before

Order ~ 10

prescribing oxycodone. *Id.* Moreover, Mr. Madsen refused to submit a urine sample for follow-up testing. Given these circumstances, the ALJ decided he could not accept Mr. Madsen's testimony at face value.

Mr. Madsen takes exception to the ALJ's interpretation of the evidence. He claims the mere abuse of drugs says little about his credibility. While that may be true in some cases, this does not appear to be one of them. Contrary to Mr. Madsen, the ALJ did not discount his credibility merely because he failed a drug test. There is more to the story. When Dr. Escanio confronted Mr. Madsen with the results, he attempted to explain them away. He adhered to the explanation in his testimony at the administrative hearing. The ALJ had to decide whether Mr. Madsen's explanation was credible. In the end, he decided the explanation was incredible.

Mr. Madsen's explanation of the test results was not the only factor the ALJ used to evaluate his credibility. Another factor was Mr. Madsen's behavior during his second appointment with Dr. Baker. As will be recalled, Dr. Baker noticed inconsistencies. During the exam, Mr. Madsen insisted his ability to

Order ~ 11

move his head was severely limited. However, both before and after the exam, Mr. Madsen's movements suggested to Dr. Baker he had overstated both the degree of his impairment and the pain associated with it.

Mr. Madsen takes exception to the ALJ's interpretation of his behavior during the second appointment with Dr. Baker. Mr. Madsen insists the ALJ should have given him an opportunity at the administrative hearing to rebut Dr. Baker's conclusions. The problem with Mr. Madsen's argument is this: He did have an opportunity. Dr. Baker's concerns were a matter of record. Mr. Madsen could have addressed them at the hearing had he chosen to do so. Furthermore, and more importantly, there is no reason to think Mr. Madsen could have rebutted Dr. Baker's conclusions had he attempted to do so.

To summarize, the ALJ provided a number of reasons for discounting Mr. Madsen's testimony. The ALJ's two strongest reasons are discussed above. Either individually or in combination, they provided the ALJ with an adequate basis for his skepticism. One of the factors the ALJ considered in assessing Mr. Madsen's credibility was his explanation of test results indicating he had

Order ~ 12

consumed methamphetamine.  Mr. Madsen admitted his explanation "sounds kind of corny."  (TR 54).  Indeed, it does.  A reasonable fact-finder would be justified in deciding, as the ALJ Did, that Mr. Madsen's explanation of the test results is unworthy of credence.  Such a determination is very damaging.  It suggests Mr. Madsen is an unreliable witness.  An ALJ properly may discount the testimony of a claimant who gives testimony that is less than candid or unworthy of belief.  *Smolen*, 80 F.3d at 1284.  However, there is more.  Mr. Madsen's credibility was further undermined by Dr. Baker's observations.  The ALJ undoubtedly knows Dr. Baker has been trained to assess the significance of his patients' movements.  Dr. Baker explained why he became suspicious.  In view of Dr. Baker's explanation, the ALJ reasonably could have concluded both that he had an adequate factual basis for evaluating Mr. Madsen's movements and that his interpretation of the movements was justified.  Thus, the ALJ reasonably accepted Dr. Baker's conclusion that Mr. Madsen's movements were inconsistent:  that he behaved one way when he knew he was being watched; that he behaved in a materially different way when he did not realize he was

Order ~ 13

being watched.  An ALJ may consider inconsistent behavior in assessing credibility.  *See Rounds v. Comm'r of Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir.2015).

Credibility determinations are the province of the fact-finder, not a reviewing court.  In part, this is because the fact-finder has an opportunity to evaluate a witness' demeanor as he testifies.  A reviewing court lacks this critical insight.  Thus, as long as the fact-finder's credibility determination is supported by substantial evidence, a reviewing court must defer to it.  *See Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir.2008).  This is such a case.  The ALJ's decision to discount Mr. Madsen's testimony is, in fact, supported by substantial evidence.  Consequently, this Court will not second guess the ALJ's determination.  *Id.*

**WEIGHING OF DR. HULL'S OPINONS**

As will be recalled, the SSA sent Mr. Madsen to Thomas R. Hull, M.D., for an evaluation. Among other things, Dr. Hull had Mr. Madsen perform a number of movements.  (TR 216-17.)  Presumably, Dr. Hull expected Mr. Madsen to do his

Order ~ 14

best. After examining Mr. Madsen, Dr. Hull completed a four-page form. Dr. Hull was pessimistic. He does not think Mr. Madsen is capable of performing "any activity requiring use of the arms." (TR 217.) The ALJ discounted Dr. Hull's opinion for essentially two reasons. For one thing, he questioned whether Mr. Madsen had given his best effort. (TR 29.) For another thing, he questioned whether the record supports such a pessimistic assessment. *Id.*

Dr. Hull was an examining physician. An ALJ may discount the opinion of an examining physician only if he has clear and convincing reasons for doing so. *Regennitter v. Comm'r. of Soc. Sec. Admin.*, 166 F.3d 1294, 1298 (9th Cir.1999). Mr. Madsen maintains the ALJ's reasons fall well short of the mark. As Mr. Madsen observes, the record is replete with medical evidence documenting severe impairments of a type that are capable of limiting his use of his arms.

Mr. Madsen has point. It is undisputed he suffers from severe impairments. Nevertheless, the ALJ raised two valid issues. To begin with, Dr. Hull's conclusion is only as valid as the data upon which it is based. If Mr. Madsen did not render his best effort on the various tests, then Dr. Hull relied

Order ~ 15

upon misleading data.  The ALJ was rightly suspicious in that regard.  There is substantial, credible evidence of malingering in the record.  Furthermore, while the existence of Mr. Madsen's impairments is well documented, the impact of his impairments is far from certain.  As the ALJ properly noted, some of the test results suggest Dr. Hull's opinion is too pessimistic.  (TR 29.)  Thus, the ALJ had a clear and convincing basis for discounting Dr. Hull's opinion.

**CONCLUSION**

A reviewing court should not substitute its assessment of the evidence for the ALJ's.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir.1999).  To the contrary, a reviewing court must defer to an ALJ's assessment as long as it is supported by substantial evidence.  42 U.S.C. § 405(g).  As explained above, the ALJ carefully reviewed the record.  While the ALJ agreed Mr. Madsen suffers from severe impairments, he discounted Dr. Hull's assessment of Mr. Madsen's limitations, just as he discounted Mr. Madsen's description of the intensity, persistence, and effects of his limitations.  The ALJ provided clear and convincing reasons for his credibility determinations; reasons that are supported by substantial evidence.

Order ~ 16

Consequently, the Court will defer to the ALJ's determination Mr. Madsen is not disabled within the meaning of Title XVI. The ALJ's determination will be affirmed.

**IT IS HEREBY ORDERED**:

1. The defendant's motion for summary judgment (**ECF No. 13**) is **granted** and the plaintiff's (**ECF No. 12**) is **denied**.

2. The ALJ's decision of June 10, 2013 (TR 31) is **affirmed**.

**IT IS SO ORDERED**. The District Court Executive is hereby directed to file this Order and furnish copies to counsel.

**DATED** this 7th day of June, 2016.

s/Fred Van Sickle
FRED VAN SICKLE
Senior United States District Judge

Order ~ 17